JAMES BARKER,

        Plaintiff,

  v.

PACCAR, INC. D/B/A KENWORTH,
      Defendant.

Case No. 2:18-cv-338
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

## OPINION AND ORDER

This matter is before the Court on Defendant Paccar, Inc. D/B/A Kenworth Truck Company's ("Defendant" or "Paccar") Motion for Summary Judgment. (ECF No. 28). Plaintiff responded (ECF No. 36) and Paccar replied (ECF No. 37). Accordingly, this matter is ripe for review. For the reasons stated herein, Paccar's Motion for Summary Judgment (ECF No. 28) is **GRANTED.**

### I.

#### A.    Background

On April 13, 2018, Plaintiff James Barker ("Barker" or "Plaintiff") commenced this action. On May 2, 2018, Barker filed a five-count Amended Complaint against his former employer, Defendant Paccar, Inc. d/b/a Kenworth Trucking ("Paccar" or "Defendant") and David Lewis ("Lewis") the assistant human resources manager for Paccar. The Amended Complaint alleges: 1) wrongful termination based on age discrimination, in violation of Ohio Rev. Code §§ 4112.02 and 4112.99; 2) Family Medical Leave Act ("FMLA") retaliation; 3) FMLA interference; 4) workers' compensation retaliation, in violation of Ohio Rev. Code § 4123.90; and 5) wrongful termination in violation of public policy ("*Greeley* claim"). (Am. Compl. ¶¶ 55–112 [ECF No.

7]). Plaintiff has dismissed this action against Lewis. (*See* ECF No. 27). Thus, Barker only pursues these claims against Paccar.

## B.    Barker's Employment History with Paccar

Barker is a former employee of Paccar. He was 58 years old on October 18, 2017, when Paccar terminated his employment. Paccar manufactures medium and heavy-duty trucks. Paccar operates a heavy truck assembly plant in Chillicothe, Ohio, known as Kenworth Truck Company. Paccar first hired Barker as an assembly specialist on May 30, 2006; however, Barker was laid off on February 2, 2007. (Pl. Dep. at 34:1–5 [ECF No. 32]). Paccar recalled Barker on October 1, 2010; and in 2011 Paccar promoted Barker to Team Lead in the Engine Trim Department. (*Id.* at 34:20–22, 40:17–41:1). As Team Lead, Barker oversaw between ten to twelve other employees; and in the months prior to his termination, six of the workers he oversaw were female. (*See id.* at 44:20–24). Barker was charged with assigning tasks to the employees he oversaw. (*See id.* at 44:3–11). Barker did not, however, have the authority to discipline the workers in the Engine Trim Department. (*Id.* at 82:7–12).

When assigning employees to work in certain areas on certain tasks, Barker had to ensure they had the requisite training to work on that task; but Barker did not take an employee's preference into consideration when assigning jobs. (Pl. Dep. at 52: 20–23; *see also* Perkins Dep. at 22:18–23:7 [ECF No. 38-1]). Barker's direct supervisor, Harry Perkins ("Perkins") interacted with Barker on a daily basis since 2013, and trusted Barker in his ability to assign workers to certain jobs. (Perkins Dep. at 12:11–21).

Prior to his termination, Barker never received formal discipline and his performance evaluations were regularly good. (*See* Perkins Dep. at 17:3–17, 22:1–6; Rigsby Dep. at 63:4–8 [ECF No. 31]). Further, before the alleged events leading up to his termination, neither Perkins

nor Dave Lewis ("Lewis"), the human resources representative for the second shift, received any sexual harassment complaints about Barker. (Lewis Dep. at 41:13–18 [ECF No. 30]; Rigsby Dep. at 17:9–17, 63:4–8; Perkins Dep at 15:23–16:14). And, to Perkins' knowledge, Barker got along with the Engine Trim employees; Perkins further stated that he had no reason to believe that the female employees in the Engine Trim Department were afraid of Barker. (Perkins Dep. at 38:20–23, 39:14–17).

## C. Paccar's Policy for Taking FMLA Leave

If a Paccar employee's need for FMLA leave was foreseeable, Paccar had the following policy:

> If leave is foreseeable, the employee must give notice as soon as practicable, preferably at least 30 days in advance. . . .
>
> * * *
>
> When an employee seeks leave for the first time for an FMLA qualifying event, the employee need not expressly assert FMLA rights or even mention the FMLA.
>
> * * *
>
> If an employee does not have a reasonable excuse for failing to give notice, leave may be delayed until proper notice has been given. When planning medical treatment, the employee must consult with their supervisor and make a reasonable effort to schedule leave so that it does not unduly disrupt the Company's operations.

(FMLA Guidelines at 6–7 [ECF Nos. 32-1–32-2, Ex. 9, PAGEID ## 662–75]).

Paccar's Employee Handbook for employees who worked at Kenworth Chillicothe also contains information about the process for obtaining approval for FMLA leave and for what reasons an individual could take FMLA leave:

> The following conditions apply to FMLA leave:
>
> - FMLA for your own health condition will be paid using available sick time (40 hours), then all available vacation including birthday and floating holiday. If additional time is needed it will be unpaid time.

3

- If you are taking Family Medical Leave for the birth or placement of a child, or to care for an immediate family member, you must first take all accrued vacation as part of you [sic] FMLA benefit then no pay will be utilized.
- An approved disability of more than three days for your own serious health condition will be considered as FMLA leave.
- You are required to provide 30 days advance notice of the need to take FMLA leave if the leave is foreseeable.
- You are required to provide a medical certification, issued by a health care provider.
- Your health care coverage will continue while you are on FMLA leave provided you pay the required monthly contribution.

(Employee Handbook at 13 [ECF No. 32-2, Ex. 10, PAGEID ## 676–703]).

And Lewis's testimony generally mirrored the FMLA procedure outlined in the Employee

Handbook and FMLA Guidelines:

> Q     All right. Generally, what would be the procedure if an employee did want to request FMLA?
>
> A     They would present to Medical to get FMLA paperwork, short-term disability and FMLA paperwork.
>
> Q     They would do that through Medical, they wouldn't do that through you?
>
> A     No.     I don't have anything to do with that. I can recommend them for employees to go over there but I don't have anything to do with handing out of the paperwork.

(*See* Lewis Dep. at 23:20–24:4). Perkins testified similarly:

> Q     What is your understanding of how the FMLA process works?
>
> A     It's federal regulated, and you apply to it through Medical is about all I know. Other than you have to have so many hours of work in before you can qualify for it.
>
> Q     So a little more specifically. If an employee wanted to take FMLA leave, based on your understanding do they go to HR? Do they go to Medical? Where do they get the paperwork?
>
> A     I believe they have to go get it from the nurse. I would send you to Medical. I don't know what happens after that.

(Perkins Dep. at 26:12–24).

4

**D.     Barker's Medical Issues**

In July 2017, Barker visited a physician, who diagnosed him with a stress fracture from walking on concrete. (Pl. Dep. at 111:8–20). Barker testified that he spoke with Lewis, Perkins, Charles Newberry ("Newberry"),[1] and Dan Tatman ("Tatman") about his foot pain before he went to the doctor. (Pl. Dep. at 111:19–112:8, 112:23–113:1). Barker spoke with each of these individuals about his foot pain on several occasions. (*Id.* at 113:18–114:2, 115:3–5; *see* Perkins Dep. at 25:3–14). Barker generally told these four individuals the same thing: he was experiencing severe pain in his foot; the pain was at its worst when he awoke; and that the pain worsened while he was at work. (*Id.* at 112:13–18; 113:9–14; 114:3–12; 115:3–9). Barker states that he also showed Lewis documentation from his physician regarding his foot pain. (*Id.* at 150:11–24). Further, Lewis testified that in August 2017, Plaintiff approached him and:

> He told me that he had an issue with his foot. I don't remember what the issue was. He had an issue with his foot. It may require surgery. He asked me if it did could I set up a light duty assignment for him. I said I could look into that, but did he want to consider short-term disability to heal. He said he didn't want to do the FMLA thing. He insisted that he wanted light duty. I asked him – I told him I would pursue that. I asked him if he had surgery would he have to wear one of those – a boot cast, one of those plastic boots. The reason for that was that would impact where I could place him in the plant in a light duty assignment. He said he thought he would. I told him that I had to have some conversations with the facility coordinator and I would get back to him.

(Lewis Dep. at 22:7–23). This conversation between Lewis and Barker was one of two or three in which the two discussed Barker's injury. (*See* Pl. Dep. at 115:3–5).

Barker submits:

> I asked [Lewis] on two or three different occasions what I needed to do to [for FMLA leave] -- what it would take or how it worked. He said well -- he told me I would have to come in early someday and get with the nurse and -- on day shift and get all the paperwork filled out, said there was an extensive amount of paperwork that had to be filled out and had to be approved.

---

[1] Charles Newberry was one of Plaintiff's managers.

(Pl. Dep. at 115:14–21). And, when asked about anything additional that Lewis had told him about the FMLA process, Barker testified:

> [Lewis was] just alluding to it being a long, drawn out process, a lot of paperwork has to be filled out. He also – at one point I asked him or was talking about my foot injury, and I said yeah -- I said boy, it's really getting worse. And he said well, you're not getting any younger. He did allude to that comment.
>
> And he was constantly asking me how much longer I had to go to retire. I was probably asked that, I would say, four to five times at least throughout our conversations.

(Pl. Dep. at 117:20–118:5). Barker testified further about the conversations he had with Lewis.

> Q.      At the time that you were speaking with Mr. Lewis about your foot injury, did you ever refer to any PACCAR policies and procedures regarding requesting FMLA leave?
>
> A.      Just asking what needed to be done, what paperwork needed to be done and such. Not specifics no.
>
> Q.      So you didn't actually look at the policies; is that right?
>
> A.      No, ma'am.

(Pl. Dep. at 117:7–16).

Barker, however, never spoke with the nurse about FMLA leave because: "I just never got the opportunity to come in early to speak with her about it, to make the arrangements to make an appointment to do that." (Pl. Dep. at 115:22–116:4). Barker was further questioned about who interfered with him applying for FMLA:

> Q.      Okay. Did anyone at PACCAR actively take steps to prevent you from applying for FMLA leave?
>
> A.      Not to prevent me, but kind of deter me, yes.
>
> Q.      What do you mean by that?
>
> A.      By alluding to it as being a long, drawn out process and a lot of paperwork and making it sound really tough.

Q. And that was Dave Lewis?

A. Yes, ma'am.

Q. And that's all he did to discourage you from filing for FMLA leave?

A. Pretty much, yes.

(Pl. Dep. at 152:4–17).

Lewis submits that he never told Barker that the FMLA process was complicated or that the process was drawn-out. (Lewis Dep. at 27:19–24). And that others at Paccar have taken FMLA leave before, including Mike Murphy ("Murphy") and Tambra Pfeifer ("Pfeifer").

Barker was also aware that other Paccar employees had taken FMLA leave. (Pl. Dep. at 115:22–116:4; 119:7–120:6). He also knew that Murphy had taken FMLA leave. (*See id.* at 129:5–17). But Barker states that Lewis referred to these individuals as "FMLA people." (*See* Pl. Dep. at 144:15–24, 145:15–23). Barker further testified:

> Mike was another case that -- everyone seemed like they could not wait to get rid of Mike. Mike had several health issues. He had -- I believe he had a hip replacement or a knee replacement, one, and then he had back trouble, and he was -- he was referred to as one of the FMLA people.
>
> And I know -- I know the occasion that he did get terminated, that Dave come [sic] out on the floor and said well, Mike won't be back anymore, said we've gotten rid of him.

(Pl. Dep. at 129:7–17). Barker also stated that Lewis told him that: "[Murphy] had taken off so many times within like his three or four years of employment, that if he averaged that, if he worked there until he retired, then his time off would be like 40 times that he would have taken off the entire time he was there . . . ." (*Id.* at 139:20–25).

Lewis contradicts Barker. While Lewis submits that he spoke with Murphy "about his fitness for duty[,]" and that they "talked about his manageable time and his unmanageable time

missed," and that Lewis noted that Murphy "was on track to miss a lot of time if he worked his entire career at Kenworth[,]" Lewis states that Murphy is still employed at Paccar. (Lewis Dep. at 33:6–17).

Barker was also aware that another employee, Tambra Pfeifer ("Pfeifer"), in the Engine Trim Department had been approved to take FMLA leave and had, in fact, taken FMLA leave. (Pl. Dep. at 57:10–16; 57:20–58:7). Pfeifer is no longer employed at Paccar. (*Id.* at 145:24–146:1; Lewis Dep. at 36:22–37:2).

E.   **Paccar's Sexual Harassment Policy**

Paccar's sexual harassment policy is as follows:

Sexual harassment consists of verbal or physical acts of a sexual nature that result in a tangible employment action or conduct that interferes with an individual's work performance or creates an intimidating, hostile or offensive working environment. Some examples of conduct that may be considered sexual harassment include offensive or unwelcome sexual advances including physical contact; requests or demands for sexual favors; unwelcome verbal comments or jokes of a sexual nature; displays of sexually suggestive objects or pictures in the workplace.

(Def. Policy Bulletin at 1 [ECF No. 32-1, Ex. 7 PAGEID ## 642–43]). Barker was aware of Paccar's sexual harassment policy as, on multiple occasions in 2017, Barker reported to his managers, Perkins and Newberry, two Engine Trim Department employees—Erica Meeks ("Meeks") and Jamie Blackburn ("Blackburn")—for making sexual comments while at work. (*See* Pl. Dep. at 69:25–74:12, 76:18–78:3). Barker testified that he was uncomfortable around Meeks and Blackburn and avoided being around them while alone because they frequently made sexual comments. (*Id.* at 81:15–19). Barker, however, did not have the authority to discipline either Blackburn or Meeks. He claims that he simply reported them for their conduct. (*See id.* at 82:7–12). Perkins testified regarding whether Barker ever reported Meeks or Blackburn for sexual harassment:

Q    All right. I'm going to ask you if you recall somewhere around mid-2017 if [Barker] came to you and reported that Erica Meeks had made some comments of a sexual nature on the floor?

A    I'm going to say I do not recall that.

Q    So during [Barker's] testimony he talked about a time where Erica Meeks was on the line talking about essentially having sex with a couple of guys and he indicated that he reported that to you and you guys talked about that. Do you recall that?

A    I do not recall that being reported.

Q    Do you know the name Charles Newberry?

A    Yes.

Q    Do you know if [Barker] ever reported that sexual talk from Erica Meeks to Mr. Newberry?

A    I do not.

Q    Did you and Mr. Newberry ever talk about that?

A    We did not.

Q    Can you recall any time when [Barker] reported any misconduct by Erica Meeks to you?

A    No.

Q    Moving on to Jamie Blackburn. Can you think of any time when [Barker] reported any kind of misconduct, comments, inappropriate behaviors from Jamie to you?

\* \* \*

A    I don't believe so.

Q    Again, during his testimony he generally talked about how Jamie would make comments about -- sexual comments about her weekend having sex with her boyfriend, things like that. Do you recall [Barker] ever reporting any of that to you?

A    I do not.

Q    Do you recall if [Barker] ever made any complaints to you about Jamie Blackburn?

A    I would have to say complaints, no. But Jamie is a very loud, obnoxious person. So in passing in conversation did Jamie's name come up in that capacity, I would assume.

* * *

Q    Did [Barker] ever tell you that he did not feel comfortable being alone with any female employees?

A    No.

Q    Are you aware of any discipline that Erica Meeks received when she was employed with PACCAR?

A    Not that I'm aware of.

Q    What about Jamie Blackburn?

A    Not that I can think of.

(Perkins Dep. at 29:18–30:17, 30:20–31:7, 31:24–32:6).

Barker submits that other have violated Paccar's sexual harassment policy, including Matt Martin ("Martin") and Mike Aker ("Aker").[2] (Lewis Dep. at 46:15–18; 47:10–25). Martin was demoted but is still employed at Paccar. (*Id.* at 46:24–25; Rigsby Dep. at 95:24–96:1). As to Aker, human resources received a complaint from two employees stating Aker called a female Paccar employee a derogatory term. (Perkins Dep. at 44:8–16; Rigsby Dep. at 96:10–14). When asked about his understanding of the allegations against Aker, Lewis, who participated in the investigation, testified:

A female employee had went to the area manager for the mainline about a derogatory comment that Mike Aker said about her but not to her. An investigation was done. We brought down an employee that was identified as hearing this

---

[2] Plaintiff submits that Mike Aker replaced him as the Engine Trim Department lead after Paccar fired Plaintiff.

comment and he and another employee heard it. He said it. It was not directed at her. She never even heard it, but he made a derogatory comment to those two men.

(Lewis Dep. at 47:18–25). Aker's discipline for this conduct was: "A verbal counseling, demotion to Grade 3, and transferred out of engine trim back to the department he came from." (*Id.* at 48:5–8). Aker, however, is still employed at Paccar. (*Id.* at 48:1–2).

## F.    Sexual Harassment Allegations

Paccar first received an anonymous complain in October 2017 that stated: "Just a comment: There are women on the floor that are afraid to go to HR about Sexual Harassment. They are afraid of losing their job because of the friendship that the Harasser has with the HR Rep." (Rigsby Dep. at 80:20–23; *see also* Oct. 19, 2017 Paccar Employee Input ¶ 4 [ECF No. 32-3, Def. Ex. 24, PAGEID ## 721–726]). After receiving this anonymous complaint, Katherine Rigsby ("Rigsby"), the human resources supervisor for the second shift, and Craig Rybolt ("Rybolt"), one of Barker's supervisor, reviewed Paccar's sexual harassment policy with the second shift employees during a regularly-scheduling meeting. (*Id.* at 27:1–5).

Soon after this meeting, Paccar received a second anonymous complaint, which stated:

I think it is time for a little more information about the sexual harassment comment.

The women are afraid of the lead retaliating against them, with his buddy in HR (D.L.). The lead (J.B.) has made comments on how the two of them have worked together on getting employees fired or moved from the dept. Also, the women are afraid of him having their personal info (address, phone number, etc.) if they were to go to someone about this. Afraid that if he is fired for the remarks etc. that he will come after them at home, or on the way home. The women will not say anything about this, because of fear. Is it okay that employees are afraid of doing what is right? Or that you have an employee in a lead position that exploits power?

Also, I think it is pretty sad that someone that just became a unit manager knows of this and has not said anything. So much for been [sic] able to go to people.

(Rigsby Dep. Ex. 1 at PAGEID # 330 [ECF No. 31, PAGEID ## 330–380]).

Paccar determined that "J.B." was Barker, and quickly began to investigate the allegations, as called for under Paccar's sexual harassment policy. Rigsby and Deb Symmons ("Symmons"), Director of Human Resources for the entire Kenworth Division worldwide, conducted the investigation. (*See* Rigsby Dep. at 33:20–22). Rigsby and Symmons identified "D.L." to be Dave Lewis, and he was recused from the investigation because of the possible conflict of interest. (*Id.* at 35:8–14).

Between October 10, 2017 and October 12, 2017, Rigsby and Symmons (collectively the "investigators") interviewed eleven of the approximately thirty employees from the Engine Trim Department, including all six female employees. (*See* Rigsby Dep. at 34:4–8; *see generally* Rigsby Dep. Ex. 1). Rigsby and Symmons did not, however, interview Perkins, Barker's direct supervisor. (Rigsby Dep. at 37:3–4, 75:14–16).

During the interviews, Rigsby took notes on what the interviewee said. (*See* Rigsby Dep. at 29:19–31:6; *see generally* Rigsby Dep. Ex. 1). Rigsby then turned her notes into bullet-pointed statements that the interviewee would read and sign. (Rigsby Dep. at 30:25–31:6). Ten of the individuals that Rigsby and Symmons interviewed signed the witness statement. (Rigsby Dep. Ex. 1 at PAGEID ## 334–344). And several individuals stated that Barker had harassed them or that they had personally witnessed Barker sexually harass another. (*See generally id.*).

When asked whether she had experienced harassment in the Engine Trim Department, Jamie Blackburn ("Blackburn") told Rigsby and Symmons:

- [Barker] told her that he knew her nipples are pierced because of the shirts that she wears
- [Barker] asked if her vagina was pierced as well.
- There was a comment made where [Blackburn] said that the engine is squirting. [Barker] was making a derogatory remark about squirting (a bodily function).
- [Barker] told her that he would smack her tits off.
- [Barker] told her that he is a dirty old man.

\* \* \*

12

- In the meeting, [Blackburn] stated that she though [Barker] wanted to keep her alone and away from the other females.
- Everyone knows not to leave her alone with [Barker].
- [Barker] told her to wear tighter clothes.
- [Barker] made comments about her underwear.
- [Barker] has made comments about her menstrual cycles, and telling her when it to expect the cycle [sic].

\* \* \*

- Josh was told by [Barker] (allegedly) to handle her. [Barker] made a comment to her "when Josh is gone, you're a\*\* is mine."

\* \* \*

- [Barker] told her that if she told that he is coming for her.
- [Barker] made a statement to her that women have 2 roles: to be in the kitchen, and bedroom.
- [Blackburn] stated that [Barker] treats males and females differently.
- [Blackburn] does not feel safe.
- [Blackburn] feels safer in daylight.
- [Blackburn] stated that [Barker] talks about his connections: David Lewis and John (she could not give a last name).
- [Barker] made a comment about her boyfriend being two hours away if she ever needed him.

\* \* \*

- [Blackburn] stated that she has a mind numbing fear with him. . . .

(Rigsby Dep. Ex. 1 at PAGEID # 334). Charlotte Johnson ("Johnson") stated:

- The team lead [Barker] cusses at employees.
- I haven't seen it, but others in the department described being sexually harassed.

\* \* \*

- [Barker] talks to one girl all of the time.

\* \* \*

- [Barker] is telling everyone that he has that power. (HR)
- [Johnson] has heard stories about [Barker], but has not seen it.

\* \* \*

- Outside in the EDC, [Barker] said to [Johnson] that him and his wife were not having sex.

(*Id.* at PAGEID # 337). Amanda Boggs ("Boggs") also described instances that she stated Barker

harassed her:

- At the end of shift [Barker] asked that I text him, and he said that he would turn his phone down so no one could hear it ring. The next day, he said he waited up and wanted to know why she didn't text him.

13

- [Barker] made comments about [Boggs] posting pictures online, and that she should post more of them on her face—they are not friends on facebook and it was uncomfortable that he was looking and commenting.
- [Barker] told [Boggs] that she should "wear her hair down".
- When [Boggs] was behind or slow on wiring he would help her, but he was clear that other not be helped.
- I've avoided [Barker] and we don't walk to our cars alone.

(*Id.* at PAGEID # 341). Justin Ault told Rigsby and Symmons that Barker had asked him "after the weekends were over 'did you get any p****?'" (*Id.* at PAGEID # 343). Erica Meeks ("Meeks") told the investigators: "I have a tattoo on my side, when I reached up over an engine my shirt rode up and [Barker] saw the tattoo. [Meeks] stated that Larry overheard [Barker] talking about [Meek's] tattoos, and how [Barker] though they were sexy and he wanted see more of them." (*Id.* at PAGEID # 338).[3]

Kristy Scott ("Scott") stated:

- [Scott] was walking on line. [She d]idn't hear [Barker] walking behind her and he came up and said he was sorry if he offended her. She said she didn't know what he was talking about. He said he was talking about women in an inappropriate way and hoped she hadn't overhea[r]d.
- She was warned not to be alone with [Barker].
- She noticed one night that [Barker] was making a b-line for one of the females in the department, and when [Scott] realized it she went to the girl so there wouldn't be any problems.
- The girls are terrified of [Barker]. . . .

(*Id.* at PAGEID # 342).[4]

While several individuals told Rigsby and Symmons that they had either personally

---

[3] Meeks did not provide a surname for the "Larry" who told her this.

[4] Additionally, subsequent to Paccar's termination of Barker, Rigsby conducted a phone interview of Mike Murphy, who told Rigsby:

- [Barker] was making passes at Tambra Pfeifer, trying to get her to kiss him.
* * *
- [Murphy] heard [Barker] talk about women's pants being too tight. Example: Charlotte was mentioned as "having her tight pants on today" by JR Barker.

(Rigsby Dep. Ex. 3 [ECF No. 31, PAGEID # 382]).

experienced sexual harassment from Barker and/or had seen Barker sexually harass another, others never witnessed Barker act inappropriately. (Rigsby Dep. Ex. 1 at PAGEID ## 335,[5] 336, 339,[6] 340, 344).

On October 12, 2017, after several of Barker's female subordinates told Symmons and Rigsby that Barker had acted inappropriately towards them, Barker was suspended pending further investigation. (*See* Pl. Dep. at 122:17–25; Rigsby Dep. at 85:9–14). And because of the nature and severity of the allegations against Barker, coupled with the number of witnesses, Rigsby was given the authority to fire Barker prior to speaking with him about the allegations. (Rigsby Dep. at 24:13–19). Despite having the authority to terminate Barker, Rigsby interviewed Barker over the phone about the sexual harassment allegations on October 18, 2017. (*See id.* at 24:16–25:1). Lewis participated in the phone call as a witness because Symmons was traveling to Washington at the time. Lewis played no role in either the decision to suspend or fire Barker. (Lewis Dep. at 9:2–4, 10:8–10, 42:6–14).

During this interview, Baker was never presented with the specific allegations that had been lobbied against him. (*See* Lewis Dep. at 20:15–18; *see also* Rigsby Dep. at 88:20–89:11). However, Barker was informed that there had been sexual harassment allegations made against him. (Rigsby Dep. at 85:15–86:4, 89:12–21). Barker denied the allegation that he had sexually harassed anyone. (*Id.* at 89:17–21; *see also* Lewis Dep. at 19:6–18). Barker admitted to looking

---

[5] The Court notes that Pfeifer stated that "I know if you're a woman in manufacturing that you need to be okay with certain kinds of stuff[,]" without further elaboration. (Rigsby Dep. Ex. 1 at PAGEID # 335).

[6] The Court notes that Larry Anderson III told the investigators: "My brother made a comment that he though [Barker] had a 'thing' for one of the girls when he noticed that he was around one of the girls excessively." (Rigsby Dep. Ex. 1 at PAGEID # 339).

at other employee's Facebook profiles and pictures, which did not violate any Paccar policy. (*See* Lewis Dep. at 19:6–16)

After interviewing Barker, Rigsby believed the allegations against Barker given the consistent statements of several witnesses. (Rigsby Dep. at 89:1–6). Rigsby then informed Barker that he was being fired because he violated Paccar's sexual harassment policy. (*Id.* at 87:5–12). Barker was fired from Paccar on October 18, 2017. (*See* Rigsby Dep. Ex. 4 [ECF No. 31, PAGEID ## 383–384]; *see also* Rigsby Dep. Ex. 5 [ECF No. 31, PAGEID ## 385–386]).

Barker was replaced by either Allen Mick ("Mick"), who may be younger than 40,[7] or Mike Aker ("Aker"), who was approximately 30 years old. (Lewis Dep. at 45:25–46:3; Perkins Dep. at 43:3–13).[8]

---

[7] It is unclear exactly what age Allen Mick is, when asked: "And do you know how old Allen Mick is?" Lewis responded "I don't." (Lewis Dep. at 46:9–10). And when asked "Do you know if he's under 40?" Lewis responded "I don't." (*Id.* at 46:11–12). Perkins also testified as to Mick's age:

Q    And do you know Allen[ Mick's] age?

A    No. No, I actually don't.

Q    How old are you?

A    I'll be 40.

Q    Is Allen [Mick] older or younger than you?

A    I would have to guess.

Q    Do you think he's younger or older?

A    I think he's younger.

(Perkins Dep. at 46:6–13).

[8] It is unclear whether Mick or Aker replaced Barker as Team Lead for the Engine Trim Department; Lewis testified that Aker replaced Barker, while Perkins stated that Mick has replaced Barker.

### G.    Plaintiff's Workers' Compensation Claim

Barker went to the doctor on July 24, 2017 because he was experiencing pain in one of his feet. (*See* Pl. Dep. at 111:8–20, 191: 8–13). Barker visited the doctor again for his foot pain on October 10, 2017.[9] (*See id.* at 192:7–18). Barker, however, did not submit paperwork regarding his doctor's appointment until after Paccar had fired him. (*Id.* at 193:8–11). Barker filed a worker's compensation claim for his foot injury on November 30, 2017. (*Id.* at 194:8–22; *see also* Pl. Dep. Ex. 42 [ECF No. 32-4, PAGEID # 760]).

### H.    Procedural History

Barker's Amended Complaint alleges claims of: 1) age discrimination; 2) FMLA retaliation; 3) FMLA interference; 4) worker's compensation retaliation; and 5) termination in violation of public policy. (*See generally* Am. Compl.). After Barker voluntarily dismissed Lewis as a defendant in this matter, Barker pursues these claims solely against Paccar. (*See* ECF No. 27).

Paccar filed a Motion for Summary Judgment, asserting there remains no genuine issues of material fact. (*See generally* Mot. for Summ. J. [ECF No. 28]). Barker opposes summary on his claims for: 1) age discrimination; 2) FMLA interference; and 3) termination in violation of public policy. (*See generally* Pl. Opp'n [ECF No. 36]). Barker concedes that he has failed to make out a *prima facie* case for either his FMLA retaliation claim or his workers' compensation retaliation claim. (*Id.* at 17–18). Paccar has replied. (*See generally* Reply [ECF No. 37]). Paccar's Motion for Summary Judgment is now ripe for review.

### II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue of

---

[9] Barker submits that he visited a physician for his foot pain at least one other time between July 24, 2017 and October 10, 2017. (Pl. Dep. at 192:7–18, 193:4–7).

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to the party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts") (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.

### A.    Ohio Age Discrimination Claim

In relevant part, the Ohio Revised Code recognizes that it is an unlawful discriminatory practice "[f]or any employer, because of the . . . age . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A).  Specifically:

> No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee.

Ohio Rev. Code § 4112.14(A).  "[T]he elements and burden of proof in [an Ohio] state age-discrimination claim parallel the ADEA analysis." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) (citing *McLaurin v. Fischer*, 768 F.2d 98, 105 (6th Cir. 1985)); *see also Romano v. Hudson City Sch. Dist.*, No. 18-3969, __ F. App'x __, 2019 WL 1994555, at *5 (6th Cir. May 6, 2019).

To establish an unlawful age discrimination a party can rely on either direct or circumstantial evidence.  *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)).  Regardless of whether plaintiff establishes his case by direct or circumstantial evidence, the plaintiff must still "show that 'age was the but-for cause of the employer's adverse action.'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  In his opposition to Defendant's Motion for Summary Judgment, Barker does not direct the Court to any direct evidence of discrimination.  (*See* Pl. Opp'n at 11–15).  Instead, Barker immediately conducts the *McDonnell Douglas* analysis.  (*Id.* at 11–12).

"Where a plaintiff submits only circumstantial evidence of discrimination, [the Court] analyze[s] the claim using the familiar *McDonnell-Douglas*-burden-shifting framework." *Romano v. Hudson City Sch. Dist.*, __ F. App'x __, No. 18-3969, 2019 WL 1994555, at *6 (6th Cir. May 6, 2019) (citing *Blizzard*, 698 F.3d at 283); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If he establishes the *prima facie* case, the burden shifts to defendant to articulate a legitimate and non-discriminatory reason for its actions. *Id.* If defendant proffers a legitimate and non-discriminatory reason, the plaintiff must then establish that defendant's proffered reason is pretextual. *Id.* at 804.

Paccar, without addressing whether Barker has sufficiently made out his *prima facie* case for age discrimination, avers that "[e]ven if Plaintiff can establish a *prima facie* case of age discrimination, he cannot prevail on his claim because [Defendant] had a legitimate, nondiscriminatory reason for its actions: Plaintiff was discharged in response to a substantiated allegations of sexual harassment by his direct subordinates." (Def. Mot. for Summ. J. at 12). As such, the Court will presume, for purposes of the Summary Judgment Motion only, that Barker has established a *prima facie* case of age discrimination. Thus, the Court immediately turns to *McDonnell Douglas's* second prong.

### 1. Legitimate Non-Discriminatory Reason for Termination

Paccar asserts that it dismissed Barker after it conducted an investigation after receiving two anonymous sexual harassment allegations. (*See* Mot. for Summ. J. at 12). At the end of the investigation, Paccar concluded that Barker violated the company's sexual harassment policy and terminated his employment. (*See id.*). Violations of express company policies are legitimate, non-discriminatory reasons for taking adverse employment action. *See Blackshear v. Interstate Brands*

*Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012). Thus, Paccar has articulated a legitimate, non-discriminatory explanation for its adverse employment action. Accordingly, the burden shifts to Barker to demonstrate that a reasonable jury could deem Paccar's explanation pretext for discrimination. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 2.    Pretext for Discrimination

To establish that an employer's legitimate, nondiscriminatory reason for an adverse employment action is pretextual, a plaintiff may show that: "(1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his [termination], or (3) they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)); *see also Dunn v. GOJO Indus.*, 2017-Ohio-7230, at ¶ 15, 96 N.E.3d 870 (Ohio App. Aug. 16, 2017).

To demonstrate pretext under the first method, the plaintiff must demonstrate that the proffered reason for his termination is "factually false." *Dukes v. Associated Materials, L.L.C.*, No. 27091, 2014-Ohio-4322, at ¶ 21 (Ohio App. Sept. 30, 2014). To succeed on showing pretext under the second method, the plaintiff concedes "the factual basis underlying the employer's proffered explanation and further admit[s] that such conduct could motivate dismissal" but "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id.* (quoting *Manzer*, 29 F.3d at 1084) (emphasis, internal quotation marks and citation omitted). Lastly, a plaintiff can show pretext under the third method by demonstrating "that similarly situated employees were treated differently." *Id.*

21

Barker asserts that Paccar's proffered reason for his termination was pretextual because 1) the sexual harassment allegations were false and the investigation process was flawed; and 2) even assuming, *arguendo*, that the sexual allegations are true, other Paccar employees, including the individual who replaced Barker as Engine Trim Department lead, have been accused of sexual harassment and were not terminated. (*See* Pl. Opp'n at 13–15). Thus, Barker attempts to demonstrate pretext under all three methods. In response, Paccar asserts the honest belief defense.

The honest belief rule was initially developed by the Seventh Circuit and "provides that so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reasons is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997); *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–60 (7th Cir. 1987)).

The Sixth Circuit has somewhat modified the honest belief rule.[10] Under the Sixth Circuit's test "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Blizzard v. Marion Tech. Coll.*, 698 F.2d275, 286 (6th Cir. 2012) (citing *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)). But when "determining whether an employer 'reasonably relied on the particularized facts then before

---

[10] When the honest belief rule is raised in defense of a state law discrimination claim, Ohio courts apply the Sixth Circuit's modified honest belief rule. *See Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, at ¶ 45, 38 N.E.3d 1222 (Ohio App. Sept. 1, 2015); *Smith v. Dep't of Pub. Safety*, 2013-Ohio-4210, at ¶ 78, 997 N.E.2d 597 (Ohio App. Sept. 26, 2013); *Mattessich v. Weathersfield Twp.*, 2016-Ohio-458, at ¶ 48, 59 N.E.3d 629 (Ohio App. Feb. 8, 2016) (stating that "the 'honest belief' rule applied in federal courts has also been applied in Ohio.").

it,'" the Court does "'not require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2012); *see also Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005). And the Sixth Circuit has expressly rejected the Seventh Circuit's application of the honest belief rule to the extent it "credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology." *Smith*, 155 F.3d at 806. The Sixth Circuit noted: "The rationale behind the rule is that the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer lacks the necessary discriminatory intent." *Id.*

If the employer meets this burden, the burden then shifts to the employee to "produce 'proof to the contrary' that challenges the foundation of the employer's belief or lose on summary judgment." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 493 (6th Cir. 2019) (citing *Smith*, 155 F.3d at 807); *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (finding that "[i]f there is no material dispute that the employer made a reasonably informed and considered decision that demonstrates an honest belief . . . the case should be dismissed[.]") (internal quotations omitted). However, "[d]isputing facts is not enough—instead, the plaintiff must produce evidence 'demonstrat[ing] that the employer did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.'" *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 280 (6th Cir. 2018) (quoting *Braithwaite*, 258 F.3d at 494). But while the Court "will not 'micromanage the process used by employers in making their employment decisions,' [the Court] also will not 'blindly assume that an employer's description of its reasons is honest.'" *Id.* (quoting *Smith*, 155 F.3d at 807).

Paccar has offered evidence that it reasonably relied on the particularized facts then before it. Paccar conducted an investigation after it received two anonymous complaints of sexual harassment. Paccar determined the allegations were against Barker given the context of the two complaints and, after determining the identity of the accused, immediately began the investigation. Paccar conducted interviews of at least eleven (11) individuals. And while some individuals informed the investigators that they did not witness Barker engage in sexual harassment, at least five individuals told the investigators that Barker had either sexually harassed them or that they witnessed Barker sexually harass another.

And, despite being given the authority to fire Barker prior to interviewing him about these allegations, Rigsby elected to first speak with Barker. During his interview, Barker told Rigsby that the allegations were false and that he was innocent. However, Rigsby found the testimony of the accusers more credible than Barker's and terminated his employment with Paccar for failing to adhere with Paccar's sexual harassment policy.

The burden now shifts to Barker to come forward with evidence that challenges the foundation of Paccar's belief. Barker proffers to the Court the following evidence: 1) the brevity of Paccar's investigation, two (2) days; 2) the investigators ignored conflicting evidence that was favorable to Barker; 3) no Team Lead, Unit Manager, Area Manager, or HR Representative witnessed Barker harass another; 4) the investigators only interviewed a minority of the employees in the Engine Trim Department; 5) in the months prior to his termination, Barker had been experiencing foot pain; 6) a Paccar HR representative repeatedly commented about his age, and inquired when he was going to retire; 7) Barker was replaced by an individual outside the suspect class, either Aker or Mick; and 8) other people accused of sexual harassment were not fired but

24

reprimanded and/or demoted, including Aker, who may have replaced Barker. Further, Barker maintains his innocence as to the sexual harassment allegations.

Barker has failed to proffer evidence that Paccar did not sincerely believe in its reason for his termination. The length of the investigation is not determinative, the investigators interviewed approximately eleven individuals, and at least five of these individuals had either communicated that he or she had been sexually harassed by Barker or that they had personally witnessed Barker sexually harass another. Similarly, that the investigators did not interview every employee in the Engine Trim Department is not dispositive, as approximately half of the individuals who were interviewed told the investigators that Barker had engaged in behavior that violated Paccar's sexual harassment policy. And while Barker claims that the investigators ignored "evidence disputing" reports that Barker had sexually harassed others or "supporting Barker's innocence[,]" Barker has failed to draw the Court's attention to such evidence. Rather, the record demonstrates that the two employees Barker claims can vouch for his innocence—Jeremy Riley and Brandon Strumbo—merely told the investigators that they had never seen Barker sexually harass another, not that others reports of sexual harassment were fabrications. (*See* Rigsby Dep. Ex. 1 at PAGEID ## 336,[11] 340).[12] Similarly, the fact that no Team Lead witnessed Barker harassing another is largely immaterial and Barker's assertion that he told Lewis, an HR representative, about his foot pain and that Lewis made comments regarding Barker's age are likewise unpersuasive.

---

[11] When the investigators asked whether he had seen or experienced harassment in the Engine Trim Department, Mr. Riley told them: "He has not seen any type of harassment in the department." and "He felt that the reason that people acted different when Josh Detillian and [Barker] were their Team Leads is because Josh was new and was trying to get to know everyone." (Rigsby Dep. Ex. 1 at PAGEID # 336).
[12] Mr. Strumbo told the investigators: "No, he has not witnessed anything[,]" when asked whether he had witnessed or experienced harassment in the Engine Trim Department. (Rigsby Dep. Ex. 1 at PAGEID # 340).

First, Lewis was not involved in the investigation into the sexual harassment allegations against Barker. And the statements of non-decisionmakers alone are insufficient to prove pretext. *See EEOC v. Ford Motor, Co.*, 782 F.3d 753, 768 (6th Cir. 2015); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998). Second, the allegations of sexual harassment severs any inference of causation that arises due to the proximity in time between Barker telling Paccar employees about his foot pain and his termination from Paccar. *See Parks v. City of Chattanooga*, 74 F. App'x 432, 435–38 (6th Cir. 2003).

Barker's assertion that others outside the suspect class were treated more favorably after being accused of sexual harassment is also unpersuasive. Barker submits that Martin, Aker, Meeks, and Blackburn were all accused of sexual harassment, yet are still employed at Paccar. (Pl. Opp'n at 15). In reply, Paccar asserts that: 1) Meeks and Blackburn's conversations about sex are not analogous to repeated allegations of sexual harassment of others; and 2) neither Aker nor Martin were comparators. (Reply at 10–11) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2005)).

The Court agrees. As to Meeks and Blackburn, comments about their personal lives or conversations of a sexual nature are not similar to the allegations of sexual harassment that were lobbied against Barker. As to Martin and Aker, the Court finds the circumstances in this case similar to that in *Clayton*. In *Clayton*, the plaintiff asserted that three other employees outside the suspect class were not fired after engaging in conduct similar to the plaintiff that resulted in his termination. The *Clayton* Court distinguished the plaintiff in that none of the three alleged comparators injured a coworker. Moreover, the *Clayton* Court noted that, "[a]ll four drivers, including the plaintiff, were guilty of at least negligent conduct in the manner in which they drove their rigs away from the dock. Only [the plaintiff], however, seriously injured a coworker

rendering her totally disabled from further employment." *Clayton*, 281 F.3d at 611. Here only Barker was accused by *several* individuals of sexual harassment. Aker made one derogatory comment about a female coworker outside of her presence. As such, Paccar reprimanded Aker by issuing him "a verbal counseling, a demotion, and transferred him out of the engine trim department." (Lewis Dep. at 48:5–8). And Barker has failed to direct the Court's attention to evidence of the sexual harassment committed by Martin. Accordingly, Barker has failed to demonstrate that Blackburn, Meeks, Aker, or Martin were similarly situated comparators to him.

The Court notes that, as stated *supra*, an employer's investigation is not required to be perfect, nor must every stone be unturned. And disputing the facts, alone, is insufficient to survive summary judgment. *See Block v. Meharry Med. Coll.*, 723 F. App'x 273, 280 (6th Cir. 2018). Further, merely because another "might have come to a different conclusion if they had conducted the investigation is immaterial." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 287 (6th Cir. 2012). As such, the Court finds that even taking Barker's proffered reasons collectively, he has failed to establish a genuine issue of material fact as to whether Paccar's proffered legitimate, nondiscriminatory reason for firing Barker was pretext for age discrimination.

Accordingly, Paccar's Motion for Summary Judgment as to Barker's Ohio Age Discrimination claim is **GRANTED**.

## B.  FMLA Claims

Under the FMLA, it is unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2). Employers who violate the FMLA are liable to the employees for damages and such equitable relief as may be appropriate. 29 U.S.C.

§ 2617(a)(1).

The Sixth Circuit "has recognized two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009)).

### 1. FMLA Retaliation

For an FMLA retaliation claim, a plaintiff must establish that: he availed himself of a protected right under FMLA; he suffered an adverse employment action; and there exists a causal connection between the protected FMLA activity and the adverse employment action. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Additionally, a plaintiff must establish the employer knew of the protected activity. *Mays v. Am. Elec. Power*, No. 2:08-cv-1124, 2010 U.S. Dist. LEXIS 96369, at *28–39 (S.D. Ohio Sept. 15, 2010) (citing *Edgar*, 443 F.3d at 507–08). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar*, 443 F.3d at 508.

Defendant submits that Plaintiff is unable to establish a *prima facie* FMLA retaliation case "because he never engaged in activity protected by the FMLA." (Def. Mot. for Summ. J. at 15). Plaintiff "concedes he never applied for FMLA, and thus cannot meet the *prima facie* elements of an FMLA claim." (Pl. Opp'n at 17–18). As Plaintiff admits that he is unable to establish at least one of the essential elements of an FMLA retaliation claim, Defendant's Motion for Summary Judgment as to Plaintiff's Second Claim—FMLA Retaliation—is **GRANTED**.

### 2. FMLA Interference

#### a. *Prima Facie* Case

The *McDonnell Douglas* burden-shifting analysis, described *supra*, is applied to FMLA interference claims. *Wallace v. Edward W. Sparrow Hosp. Ass'n*, No. 18-1334, ___ F. App'x ___, 2019 WL 3406772, at *4 (6th Cir. July 29, 2019) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)) ("We analyze an FMLA interference claim based on circumstantial evidence using the *McDonnell-Douglas* burden-shifting approach.")

Pursuant to 29 U.S.C. § 2615(a)(1), it is unlawful for an employer "to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under [the FMLA statute]." To demonstrate a *prima facie* case, a plaintiff must show: (1) he is an eligible employee, (2) the defendant is a covered employer, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 507, 507 (6th Cir. 2006)).

Additionally, "[e]mployees seeking relief under the [interference] theory must [also] establish that the employer's violation caused them harm." *Id.* (quoting *Edgar*, 443 F.3d at 508) (internal citation omitted). Under the interference theory, "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred regardless of the intent of the employer." *Seeger*, 681 F.3d at 282 (quoting *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). Without addressing the other elements of the *prima facie* case, Defendant submits that Plaintiff cannot satisfy the fourth and fifth elements of a *prima facie* FMLA interference case.

### i.   Notice

"To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (brackets omitted). "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). Rather, an employee is required only to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* "The employee's burden is not heavy." *Wallace*, 764 F.3d at 586. And the employer "bears the burden of obtaining any additional information that may be needed to establish eligibility." *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 322 (6th Cir. 2018) (citing 29 C.F.R. 825.303(b)).

However, to satisfy the notice requirement, generally, the employee must provide some "indication of 'the anticipated timing and duration of the leave.'" *Wallace*, 764 F.3d at 586 (quoting 29 C.F.R. § 825.302(c)). "An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipate start of the leave." 29 C.F.R. § 825.302(d).

"Mere questions about possible leave and adjustment of working hours, without other information alerting [an employer] to [an employee's] possible intent to take such leave are insufficient." *Keogh*, 752 F. App'x at 322 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005)). Thus, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health

condition." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)) (internal quotations omitted).

Paccar submits that Barker "never progressed from the 'investigating' stage regarding a FMLA request." (Mot. for Summ. J. at 16) (citing *Koegh*, 752 F. App'x at 323–24). Paccar further asserts:

> Plaintiff was aware of PACCAR's policy and procedure for requesting FMLA leave: many of the individuals on his time had filed for FMLA claims, and plaintiff himself had worked with the medical department when he had an on-the-job injury. Yet, Plaintiff never properly notified PACCAR of his intent to take FMLA leave, which is fatal to his claim. In fact, Plaintiff admitted he never requested any specific time off, or even discussed taking a specific leave of absence with anyone.

(*Id.*) (citing Pl. Dep. at 116:1–17; 117:7–16). In his Response opposing summary judgment, Barker submits that he has sufficiently demonstrated that Paccar was notified of his intent to take FMLA leave:

> Barker talked to Dave Lewis on several occasions about his desire to take FMLA leave, as well as his request for a reasonable accommodation for his foot injury. Although he never applied for FMLA leave, Barker provided the [Defendant] notice of his interest in doing so.

(Pl. Opp'n at 16). In its Reply, Paccar maintains that Barker never properly notified Paccar of his intent to take FMLA leave and asserts: "Even after [Barker] was informed of the steps to take to initiate a leave request, Plaintiff never reported to medical to commence the process, even though he was fully aware that was the first step." (Reply at 11) (citing Pl. Dep. at 86:12–19; 116:–14). And, as such, "Plaintiff did not progress past the investigating stage regarding a potential FMLA request." (*Id.* at 11–12).

Barker failed to provide Paccar with the requisite notice of his intent to take FMLA leave. Under Paccar's FMLA Policy:

> If leave is foreseeable, the employee must give notice as soon as practicable, preferably at least 30 days in advance.

\* \* \*

When an employee seeks leave for the first time for an FMLA qualifying event, the employee need not expressly assert FMLA rights or even mention the FMLA.

\* \* \*

If an employee does not have a reasonable excuse for failing to give notice, leave may be delayed until proper notice has been given. When planning medical treatment, the employee must consult with their supervisor and make a reasonable effort to schedule leave so that it does not unduly disrupt the Company's operations.

(Def. FMLA Guidelines at 6–7).

Barker first complained of foot pain to his supervisor and human resources representative in July 2017. And, taking Barker's version of the facts as true, Lewis informed him that to be approved to take FMLA leave he needed to visit Paccar's onsite medical office to fill out the required paperwork. Barker concedes he never visited medical and "he never applied for FMLA." (Pl. Opp'n at 16). Paccar fired Barker in October 2017.

Paccar's FMLA policy is clear. If taking FMLA leave is foreseeable, then an employee must first visit medical and fill out the FMLA paperwork to gain approval for FMLA leave. (*See* Perkins Dep. at 26:12–24; Lewis Dep. at 23:20–24:4; *see also* FMLA Guidelines at 6–7; Employee Handbook at 13). And Barker acknowledges that Lewis informed him that he needed to visit Medical to get the paperwork he would need to fill out before being approved to take FMLA leave. (Pl. Dep. at 115:14–21). Barker failed to comply with Paccar's "customary notice and procedural requirements for requesting leave[.]" 29 C.F.R. § 825.302(d). And Barker does not submit, nor would the facts support, a finding that "unusual circumstances" warranted his failure to comply with Paccar's FMLA policy.

Barker's submission that his conversations with Lewis provided Paccar with sufficient notice of his intent to take FMLA leave is not well taken. Taking Barker's version of the facts as

true, in Barker's conversations with Lewis, Lewis told him that in order to get approval to take FMLA leave he would need to report to Medical and fill out the required paperwork. (Pl. Dep. at 115:14–21). Barker admits that he never went to Paccar's medical department seeking to obtain FMLA leave and he never filled out the requisite paperwork to get approval for taking FMLA leave. (*Id.* at 115:22–116:4). Further, during these alleged conversations, Barker did not speak with Lewis about the timing or duration of any potential FMLA leave. Thus, Barker's conversation or conversations with Lewis did not provide Paccar with the requisite notice of his intent to take FMLA leave, rather Barker's conversations amount to nothing more than investigation into the process of being approved to take FMLA leave.

### ii.    Denial of or Interference with Rights

Even assuming, *arguendo*, that Barker had provided Paccar with notice of intent to take FMLA leave, Barker's FMLA interference claim would still fail as he has not established that Paccar denied him the rights guaranteed by the FMLA. Paccar submits that "any employee of ordinary fitness would not have been deterred from taking FMLA leave by the simple truth that it involves some time and paperwork." (Reply at 12). Barker submits that he was, in fact deterred, from further proceeding to seek approval for taking FMLA leave because of the comments that Lewis made regarding individuals who took FMLA leave and the way he described the process of getting approval to take FMLA leave. (Pl. Opp'n at 17). Lewis denies telling Barker that the process of getting approved to take FMLA was complicated or drawn-out. (Lewis Dep. at 27:19–24). Yet, even taking Plaintiff's version of the facts as true, Barker failed to demonstrate that Paccar denied and/or interfered with his rights under the FMLA. Barker admits that he "just never got the opportunity to come in early to speak with" Medical about taking FMLA leave. (*See* Pl. Dep. at 115:22–116:4). Barker points to no evidence that Lewis, or anyone else at Paccar, barred

him from going to Medical to fill out the required paperwork. (*See id.* at 152:4–17). Accordingly, Barker has also failed to establish the fifth element a *prima facie* case of FMLA interference.

Barker has failed to establish the fourth and fifth elements of a *prima facie* FMLA interference case; that Defendant had notice of Plaintiff's intent to take FMLA leave. Accordingly, the Court need not move to the next step in the *McDonnell Douglas* analysis and Defendant's Motion for Summary Judgment as to Plaintiff's third claim for relief is **GRANTED**.

### C.    Ohio Workers' Compensation Retaliation Claim

Plaintiff concedes "there is no dispute [he] applied for Workers' Compensation benefits after he was terminated from PACCAR. Thus, he cannot meet his *prima facie* elements for Workers' Compensation retaliation" under Ohio law. (Pl. Opp'n at 18). Accordingly, Defendant's Motion for Summary Judgment as to this claim is **GRANTED**.

### D.    *Greeley* Claim

In general, Ohio is an at-will employment state. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 241 773 N.E.2d 526 (Ohio 2002). An employer can terminate an employee's employment for any lawful reason. *Id.* When, however, an employer has wrongfully discharged an individual contrary to public policy, there is an exception. *Greeley v. Miami Valley Maint. Contractors, Inc.*, 49 Ohio St. 3d 228, 233–34, 551 N.E.2d 981 (Ohio 1990), *see also Painter v. Graley*, 70 Ohio St. 3d 377, 383–84, 639 N.E.2d 51 (Ohio 1994).

To succeed on a *Greeley* claim, a plaintiff must establish four elements:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*O'Connor v. Nationwide Children's Hosp.*, 723 F. App'x 321, 322 (6th Cir. 2018) (citing *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005)) (alterations in original). The clarity and jeopardy elements are questions of law; whereas the causation and overriding justification elements are questions of fact. *Id.* (citing *Collins v. Rizkana*, 73 Ohio St. 3d 65, 70, 652 N.E.2d 653 (Ohio 1995)).

Barker alleges that Paccar terminated him because an injury that he sustained while at work but before Plaintiff was able to file a workers' compensation claim. (Am. Compl. ¶¶ 106–108). In its Motion for Summary Judgment Paccar does not address the first *Greeley* claim element. (*See* Mot. for Summ. J. at 17–18). Rather, Paccar appears to assert that Barker has failed to establish the jeopardy, causation, and overriding justification elements of his *Greeley* claim, as a matter of law. (*See* Mot. for Summ. J. at 17–18).

Paccar asserts that, as Barker began to experience foot pain approximately three-months before his termination, he had ample time to file a worker's compensation claim, if he believed that he sustained this injury while working. (Mot. for Summ. J. at 18). Further, Paccar avers that "a plaintiff must prove that the adverse employment action was retaliatory, which requires proof of a nexus between the adverse employment action and the potential workers' compensation claim." (*Id.*) (citing *Sutton v. Tomco Mach., Inc.*, 129 Ohio St. 3d 153, 153 (Ohio 2011)). Paccar also submits that there was a legitimate business justification for dismissing Barker because of the sexual harassment allegations against him.

Barker advances that there remains a genuine issue of material fact to his *Greeley* claim and, as such, summary judgment in Defendant's favor is not warranted. (*See* Pl. Opp'n at 17). In his deposition, Barker testified that he spoke with Lewis, Perkins, Newberry, and other Paccar employees about his work-related foot injury. (*Id.*). Barker also submits that there remains a genuine issue of material fact as to the legitimacy of Paccar's business justification for terminating his employment. (*See id.*).

The Court need not address whether Barker has established the jeopardy or causation element of his *Greeley* claim, as Paccar had an overriding business justification for terminating his employment. As discussed in more detail *supra*, Paccar avers to have fired Barker for violating the company's sexual harassment policy. And while Barker disputes the allegations of sexual harassment and the findings of Paccar's investigation into the sexual harassment allegations, Barker has failed to produce evidence in support of a finding that Paccar's proffered reason for firing him was pretext for discrimination.

Barker claims that he notified Paccar of his foot injury in July 2017 and was fired in October 2017. Barker asserts that this "proximity in time, coupled with [Paccar's] knowledge of Barker's work-related injuries" demonstrates that a genuine issue of material fact as to the legitimacy of Paccar's proffered reason for firing him. The Court disagrees. As stated above, the temporal proximity between Paccar's alleged knowledge of Barker's foot injury and his termination is largely irrelevant given the intervening sexual harassment allegations and subsequent investigation into such allegations. *See Parks*, 74 F. App'x at 437 ("Such temporal proximity alone, however, does not support an inference of non-retaliatory discrimination, particularly where, as here, an employee's discharge is readily explainable on non-retaliatory

grounds that have not been shown to be pretextual." (citations omitted)).  Thus, Barker has failed to establish the fourth essential element of his *Greeley* claim.

Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's *Greeley* claim is **GRANTED**.

**IV.**

For the reasons stated herein, Defendant Paccar's Motion for Summary Judgment (ECF No. 28) is **GRANTED**.

**IT IS SO ORDERED.**

_8 -27-2019_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**